**AFFIDAVIT OF SPECIAL AGENT SEAN SEARS IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS**

I, Special Agent Sean Sears, being duly sworn, depose and state that:

**Agent Background and Introduction**

1.      I have employed as a Special Agent with the Drug Enforcement Administration ("DEA") since April 1995.  I am currently assigned to the Boston Field Division, where I have been since 2014.  I was previously assigned to the Bangor Maine Post of Duty from 2010 to 2014, and the Chicago Financial Investigative Team from 1995 to 2010. I have a Bachelor of Science degree from Boston University School of Management.

2.      As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of the federal drug laws and money laundering laws in Title 21 and Title 18, respectively, of the United States Code.  I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3.      I have participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances; United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants, executing

arrests, and participating in court-authorized Title III wiretaps of cellular phones.  I have received extensive specialized training in the field of controlled substance identification, investigation, and enforcement.

## Purpose of Affidavit

4.      I make this affidavit in support of applications for search warrants to search the following residential locations:

      a.   44 Seafoam Avenue, Apartment #2, Winthrop, Massachusetts ("Target Location 1");

      b.   55 Belle Isle Avenue Apartment. 103, Revere, Massachusetts ("Target Location 2," and with Target Location 1, the "Target Locations")

5.      Based upon the facts set forth herein, there is probable cause to believe that evidence of the commission of money laundering offenses, in violation of Title 18, United States Code, Section 1956 and 1957, including but not limited to U.S. Currency, records, objects, and documents related to money laundering, and/or conspiracy to distribute and possession with the intent to distribute cocaine offenses in violation of Title 21, United States Code, Section 846 (the "Target Offenses") will be located at the Target Locations.

6.      Based on the facts set forth in this affidavit, there is probable cause to believe Fabio QUIJANO ("QUIJANO") and Jairo AGUDELO ("AGUDELO") (the "Target Subjects") have violated federal law, including 21 U.S.C. §§841(a)(1) (distribution and possession with intent to distribute cocaine) and 846 (conspiracy to distribute and to possess with intent to distribute cocaine), and/or 18 U.S.C. §§1956(h) (conspiracy to launder money) and 1956(a)(1) (money laundering) (hereinafter, the "Target Offenses").  There is also probable cause to believe that evidence, fruits, and instrumentalities of the Target Offenses will be found in the Target Locations, as described below.

2

7.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## Probable Cause

8.      I have been involved in an investigation into QUIJANO and AGUDELO since approximately June 2018.  On January 29, 2020, a federal grand jury in Boston returned a sealed indictment (the "Indictment") charging QUIJANO, and AGUDELO with: Count One, 18 U.S.C. §1956(h) (conspiracy to launder money, QUIJANO and AGUDELO); Count Two, 18 U.S.C. §1956(a)(1) (money laundering, QUIJANO); Count Three, 18 U.S.C. §1956(a)(1) (money laundering, QUIJANO and AGUDELO); Count Four, 21 U.S.C. §846 (conspiracy to distribute and to possess with intent to distribute 5 kilograms or more of cocaine, QUIJANO); and Count Five, 21 U.S.C. §841(a)(1) (possession with intent to distribute 500 grams or more of cocaine, QUIJANO). Also on January 29, 2020, the United States District Court for the District of Massachusetts issued warrants for the arrests of QUIJANO and AGUDELO.

### June 26, 2018: QUIJANO delivered $135,180

9.      On June 26, 2018, investigators conducted an undercover money laundering transaction with QUIJANO.  On June 25, 2018, investigators (posing as money laundering intermediaries), were contacted by an individual regarding a money pick up in the Boston area for approximately $150,000, on behalf of a Colombian money broker.  A DEA undercover agent ("UC") subsequently made contact with QUIJANO later that evening to facilitate the pickup of the U.S. Currency.

10.      On June 26, 2018, at approximately 6:34 p.m., UC called QUIJANO, who indicated

3

that he was at the Five Guys restaurant in Saugus, Massachusetts.   DEA agents observed QUIJANO retrieve a white box from a green 2004 Mini Cooper and hand the box to the UC.  Inside the box was an amount of United States currency. A final bank count confirmed that the box QUIJANO had delivered contained $135,180.

11.     After the transaction, at approximately 7:22 p.m., investigators observed QUIJANO and an unknown female park the mini-cooper and enter the residence at Target Location 1.  A review of the Massachusetts Registry of Motor Vehicles revealed that the green Mini Cooper was registered to Yomaira Arango-Villegas, with Target Location 1 listed as the registered address.

### February 19, 2019: AGUDELO Attempted to Launder $200,000 in U.S. Currency; Consent Search of Target Location 1 & Seizure of $68,811 from QUIJANO

12.     In February 2019, an individual contacted DEA investigators regarding a money pick up in the Boston area for approximately $200,000 for laundering purposes.  This individual later agreed to cooperate with investigators in March 2019, and became a confidential source at that time ("CS").[1]

13.     On February 19, 2019, CS coordinated with undercover investigators to conduct the money transfer at 1:30 p.m. CS told the undercover agent that his associate would deliver the money. Investigators later determined this associate was AGUDELO.

14.     At approximately 11:41 a.m., investigators conducting surveillance outside of a residential apartment building located at 881 Broadway, Everett, Massachusetts observed QUIJANO arrive, enter 881 Broadway, and exit again approximately 40 minutes later. From there, QUIJANO

---

1 CS is cooperating with DEA in hope that CS will receive consideration in connection with criminal charges and/or sentencing related to the seizures discussed below. CS has no known criminal history. CS has cooperated with DEA since approximately April 2019—when his and QUIJANO's suspected stash house was searched by investigators, as described below—and has provided detailed information about his co-conspirators, which has been corroborated to the extent possible by investigators. CS has also cooperated proactively against QUIJANO and others, as discussed in part below. I believe CS is reliable.

drove back to Target Location 1.

15.     At approximately 1:30 p.m., undercover investigators contacted AGUDELO, who would be delivering the money.  AGUDELO said he was driving a silver Nissan sedan.  When AGUDELO arrived at the prearranged meeting location, investigators approached him.  The driver, who was the sole occupant of the vehicle, identified himself as AGUDELO and consented to a search of his vehicle.   In the trunk, investigators located approximately $200,000 wrapped in green cellophane wrap.

16.     AGUDELO told the investigators that it was not his money and that he was paid $1,000 to drop the money for a friend. AGUDELO stated that he was directed to deliver the blue bag to a black van when it pulled up. AGUDELO stated he was told to do this by a person known only to AGUDELO as "Marco." When investigators showed AGUDELO a photograph of Fabio QUIJANO, AGUDELO said he did not recognize nor did he know the person in the photograph (QUIJANO).  AGUDELO also told investigators that he uses the black flip phone in his possession for "bad stuff," which investigators believed referred to illegal activities, including money laundering. Investigators seized the blue bag containing the currency, provided AGUDELO with a receipt, and told AGUDELO he was free to leave.

17.     Later that same day, investigators approached QUIJANO at Target Location 1, and he consented to a search of Target Location 1.  Inside, investigators seized approximately $68,800 bundled in green cellophane wrap from under a bed.  This green cellophane wrap was consistent with the green cellophane wrap used to package the approximately $200,000 that investigators seized from AGUDELO earlier that day.  QUIJANO agreed to speak with investigators.  When investigators asked where he had been earlier in the day, QUIJANO responded that he had traveled to a Target store and run some errands.  When investigators reported to QUIJANO that he had been observed

earlier in the day at 881 Broadway, QUIJANO denied being present at that location.  Investigators

asked QUIJANO if he had any keys on his person.  QUIJANO produced a key ring with several keys,

and identified all but one of the keys.  Investigators asked what the unidentified key opened, and

QUIJANO stated that it belonged to his friend's apartment in Everett, but denied any association

with that apartment.  QUIJANO consented to giving the keys to investigators.  Investigators also took

a photograph of QUIJANO, including his clothing, and sent it to surveillance officers, who confirmed

that QUIJANO was the same individual who had been observed entering and exiting 881 Broadway

earlier in the day.  QUIJANO was not detained by investigators at this time.

18.     Investigators then went to speak to the on-site representative for the management

company of 881 Broadway, and showed him the photograph that was taken of QUIJANO.  The

building representative immediately recognized the individual in the photograph, reported that the

individual lived in Apartment 14, and pointed to the front door of Apartment 14.  The building

representative further reported to investigators that he had observed the individual inside the building

earlier the same day wearing the same clothing as he was wearing in the photograph.  The building

representative did not know the individual's name, but stated that he rents Apartment 14 with another

Hispanic male and that they are frequently in the building together.  Later that same day, investigators

showed this same representative a photograph of CS. The building representative immediately

responded that he was certain that the individual depicted in the photograph was the second Hispanic

male who rented Apartment 14 and was frequently in the building with the male depicted in the

photograph shown to him by investigators earlier that day (QUIJANO).

**February 20, 2019 and April 3, 2019: Search of 881 Broadway,
Seizure of Nearly 4 Kilograms of Cocaine and Over $300,000**

19.     On February 20, 2019, the Honorable David H. Hennessy, Chief Magistrate Judge,

United States District Court, District of Massachusetts, authorized a search warrant for 881

Broadway, Apartment 14 (19-MJ-4117-DHH).  Using the keys consensually seized from QUIJANO the day before, investigators unlocked Apartment 14, and executed the search warrant.  Inside, investigators located three pressed powder discs wrapped in black tape and then clear tape.  These discs were sent to the DEA Northeast Regional Laboratory, which confirmed they contained approximately 3,040 grams of cocaine. Among other items, investigators also located approximately $10,000 in U.S. currency, a hydraulic kilogram press, 3 digital scales, and various drug-packaging materials. Investigators left a copy of the search warrant and return inside 881 Broadway, Apartment 14.

20.     In March 2019, investigators were contacted by an attorney for CS, who expressed an interest in cooperating with law enforcement following the search and seizure at 881 Broadway. Thereafter, CS provided detailed information about his own drug-dealing and money laundering activities, as well as about QUIJANO's involvement.  CS stated that he and QUIJANO worked together to distribute cocaine, and shared use of 881 Broadway, Apartment 14 as their stash location.

21.     CS reported that, on February 19, 2019, he and QUIJANO arranged to have their associate, AGUDELO, deliver the money to the undercover investigators (discussed above), because QUIJANO was worried he and CS were being surveilled.  CS admitted that the $200,000 was intended to be transferred to Colombia as partial payment for 30 kilograms of cocaine he and QUIJANO purchased in February 2019.  CS stated that, on February 19, 2019, QUIJANO had traveled to 881 Broadway to retrieve the $200,000.  QUIJANO then met with AGUDELO and paid him $1,000 to deliver the money to the undercover officers.  CS also informed investigators that additional cocaine and U.S. currency was still hidden inside the walls of 881 Broadway.

22.     On April 3, 2019, investigators consensually searched 881 Broadway, Apartment 14 again.  Hidden inside a void behind a baseboard in the apartment, investigators located an additional

829 grams of cocaine (as confirmed by the DEA Northeast Regional Laboratory), as well as a drug ledger.  Inside a void hidden within the wall of the bathroom, investigators also located a large amount of U.S. currency, later determined to be approximately $309,880.

**May 23, 2019: Recorded Meeting between CS and AGUDELO**

23.     On May 23, 2019, at the direction and under the supervision of investigators, CS contacted AGUDELO and arranged to meet with him.  Prior to the meeting, CS was equipped with an audio/video recording device.

24.     During the recorded meeting, AGUDELO told CS that he "works" for "Sebas." Based on my training and experience, and my involvement in the investigation to date, I believe "work" refers to selling cocaine, and believe that "Sebas" refers to a known drug trafficker and target of this investigation, Sebastian ARBELAEZ-Perez.

25.     Throughout the recorded conversation, AGUDELO also discussed with CS the events of February 19, 2019, discussed above, when he was stopped by investigators carrying the $200,000. AGUDELO referred to QUIJANO as "Tio" and told CS that DEA Agents had shown him a picture of QUIJANO when they seized the money from AGUDELO.  AGUDELO told CS that he had made up the name "Marco" as the person who had given AGUDELO the cash because AGUDELO didn't want to give up QUIJANO's real name. AGUDELO went on to tell CS that, on February 19, 2019, QUIJANO had delivered the blue bag containing the U.S. currency to AGUDELO's house prior to the meeting at the Hilton Garden Inn.  AGUDELO stated that QUIJANO was acting weird or nervous when he QUIJANO delivered the bag. AGUDELO told CS that if DEA Agents showed up at his house, that he "would be screwed."

26.     AGUDELO asked CS whether—if CS started "working" again—they would still be able to "work" together.  CS affirmed.  AGUDELO and CS then talked about how, in the past,

QUIJANO would deliver "8s" (code for 125 grams of cocaine) and "6-2s" (code for 62 grams of cocaine) to AGUDELO for AGUDELO to distribute. AGUDELO and CS discussed selling kilograms and ounces of cocaine in the future, and that AGUDELO could make $1,000 to $1,200 a week by distributing cocaine. AGUDELO then told CS that he wanted to make a little more money because it would just be the two of them selling cocaine now (CS and AGUDELO, and not QUIJANO). AGUDELO told CS to let him know when CS gets "organized." CS reported to investigators that he understood AGUDELO to be asking for CS to contact AGUDELO when CS had a new supply of cocaine.

### QUIJANO Payments to CS

27.     Beginning in June 2019, under the supervision and direction of investigators, CS conducted multiple recorded meetings with QUIJANO to discuss the money and drugs that were seized by investigators from 881 Broadway.  During these meetings, CS and QUIJANO discussed generally how to handle the outstanding drug debt that was still owed to the Colombian drug supplier as a result of these seizures.  QUIJANO then provided CS with tens of thousands of dollars over the course of multiple meetings, beginning in August 2019, ostensibly to help pay down their shared drug debt.  For example, QUIJANO provided CS with $10,000 (via another associate— "Associate"), on each of July 24, August 27, October 10, 2019, and January 31, 2020.

28.     Prior to the January 31 money drop off, QUIJANO told CS that he had an additional $10,000 U.S. Currency to pay down the drug debt.  Investigators established surveillance at Target Location 1.

29.     At approximately 1:25 p.m., investigators observed QUIJANO exit Target Location 1 and enter a black Chevy Cruz.  Agents followed QUIJANO as he drove to Adriana's Café, located at 19 Main Street, Winthrop, Massachusetts.

30.     At approximately 2:00 p.m., agents observed Associate enter the parking lot of the Adriana's Café and park next to QUIJANO's vehicle.  Investigators observed QUIJANO exit his vehicle carrying a white envelope and walk up to the driver side of Associate's vehicle. Investigators then observed QUIJANO walk back to his vehicle empty handed.  The vehicles then departed the area.

31.     Investigators followed Associate's vehicle to the area of 1 Webster Ave., in Chelsea, Massachusetts, where Investigators observed Associate park behind CS's vehicle. Investigators observed CS exit his/her vehicle and walk to the drivers' side of Associate's vehicle. Investigators observed Associate hand CS a white envelope.  Agents subsequently seized the white envelope from CS, and found that it contained $10,000 U.S. Currency.

### November 14, 2019: Surveillance of AGUDELO

32.     On November 14, 2019, investigators conducted surveillance of AGUDELO. AGUDELO was observed arriving at Target Location 2 operating MA registration 8GT867, a gray 2005 Toyota Corolla (the "Corolla").  AGUDELO was then observed removing an unknown item from the front passenger area of the Corolla and placing it in the trunk of MA registration 9HY451, a gray 2008 Nissan Altima (the "Altima") registered at 81 Taft Street, Revere—the address AGUDELO provided to agents as his residence when he was stopped on  February 19, 2019.

33.     Investigators followed AGUDELO from Target Location 2 in the Corolla, as he drove to 26 Barnes Street, East Boston, Massachusetts, where he double parked. Investigators observed an Unknown Hispanic Male (UHM) walk out of the ally next to 26 Barnes Street. The UHM walked to the driver's window of the Corolla for a brief moment, and then walked away with his hand in a cupped manner.  Based on my training and experience I believe this was transaction was a street-level, hand-to-hand drug transaction, with AGUDELO supplying drugs to the UHM.

10

34.     Approximately fifteen minutes later, investigators observed an Unknown Hispanic Female (UHF) walk out of the same alley next to 26 Barnes Street.  The UHF appeared to be concealing a something under her jacket. The UHF then got into the front passenger area of the Corolla. After a brief period of time, the UHF exited the Corolla, no longer appearing to be concealing anything under her jacket. The UHF was observed returning to the alley next to 26 Barnes Street. The UHF then returned to the Corolla and left the area with AGUDELO. Investigators maintained surveillance of the Corolla. Based on my training and experience, I believe the UHF brought money to AGUDELO for drugs and then brought the drugs back into a building in or near 26 Barnes Street.

35.     Later, investigators observed the Corolla return to 26 Barnes Street. The UHF exited the Corolla and walked back to the alley next to 26 Barnes Street.  Investigators followed the Corolla as it returned to Target Location 2.  AGUDELO exited the Corolla and entered Target Location 2. After approximately ten minutes, AGUDELO against exited Target Location 2, got back into the Corolla, and drove away from the area.

36.     Investigators continued to follow AGUDELO in the Corolla as he drove to various commercial locations, where he made only brief stops. Eventually, investigators observed AGUDELO exit a restaurant located at 19 Bennington Street.  AGUDELO was observed talking on his cell phone and looking back and forth at traffic on Bennington Street, as if he was waiting for someone. AGUDELO was seen waving to a white 2013 Porsche Cayenne (the "Porsche"), which had just parked on Bennington Street.  Investigators observed AGUDELO cross Bennington Street, walk to the driver's window of the Porsche, and pass an object to the operator of the Porsche. AGUDELO then walked back into the restaurant as the Porsche drove away.  Based on my training and experience I believe this was transaction was a street-level, hand-to-hand drug transaction, with

AGUDELO supplying drugs to the driver of the Porsche.

### January 3, 2020: Surveillance of AGUDELO

37.     On January 3, 2020, investigators once again conducted surveillance of AGUDELO. After establishing surveillance in the area of Target Location 2, investigators observed AGUDELO walk from Target Location 2 to the Altima, and drive away from the area.  AGUDELO drove the Altima to the parking lot of Stop and Shop, located at 40 Furlong Drive, Revere, where he parked. AGUDELO exited the Altima and walked in the direction of a white 2014 Honda Accord, registered to an individual who pled guilty in 2018, in Middlesex Superior Court, to cocaine trafficking, and who is still on probation. A brief time later, AGUDELO returned to the Altima and drove out of the parking lot. Investigators followed the Altima back to Target Location 2, where it remained only briefly, before departing again.  AGUDELO drove the Altima to the area of 83 Leverett Avenue in Revere.  Once he arrived, AGUDELO exited the Altima and stood by a concrete wall in front of 83 Leverett Avenue. An unknown person exited 83 Leverett Avenue and met briefly with AGUDELO.  AGUDELO then returned to the Altima alone and drove back to Target Location 2.

38.     A short time later, AGUDELO was observed standing at the side entrance door to Target Location 2, talking on his cell phone. Moments later, a white 2012 Nissan sedan pulled up to the stairs at the side entrance door to Target Location 2. An unidentified male ("UM") walked to the side entrance door of Target Location 2, and was let inside by AGUDELO. Approximately one to two minutes later, the UM exited the side entrance door of Target Location 2, followed by AGUDELO. The UM got back into his Nissan, AGUDELO got back into the Altima, and both vehicles left the area.  Investigators followed AGUDELO as he drove to Malden, and to Somerville, where he made brief visits inside of buildings.

12

39.     Based on my training and experience, I believe AGUDELO is involved in street-level drug dealing.  I believe the activities described above, including his frequent stops and brief meetings with multiple individuals and at multiple locations over the course of approximately three and a half hours for no apparent reason, and his observed suspected hand-to-hand drug transactions are indicative of drug trafficking. Based on his frequent trips to Target Location 2 in between the suspected drug transactions, I believe AGUDELO uses Target Location 2 as a stash location for his drugs and/or drug proceeds.

### Video Surveillance of 55 Bell Isle Avenue

40.     In October of 2019, investigators initiated video surveillance of Target Location 2. Since that time, AGUDELO has been observed, on a daily basis, arriving at Target Location 2, usually in the early afternoon. AGUDELO has been observed to arrive in either the Corolla, the Altima or a Ford Escape and proceed inside Target Location 2 via the side entrance door. Often, AGUDELO was observed exiting Target Location 2 a short time after arriving. On many occasions AGUDELO was observed proceeding to one of the vehicles with a package or bag in his hands, and appeared to be concealing the package or bag in the front passenger area of the vehicle. AGUDELO was often observed then leaving the area in one of the vehicles, only returning for brief periods, late at night or not at all.  Based on this video surveillance, which revealed that AGUDELO was rarely at Target Location 2 in the mornings, investigators do not believe AGUDELO resides at Target Location 2, but do believe AGUDELO uses this location as a stash for drugs, money and other contraband.

### The Target Locations

#### *Target Location 1*

41.     Based on the above, I believe Target Location 1 is QUIJANO's residence, and that

he uses his residence in connection with his money laundering and/or drug trafficking activities.

### Target Location 2

42.     On February 3, 2020, CS entered the building of Target Location 2 and spoke in Spanish with an El Salvadorian female (the female), who is a tenant of the building. CS told the female that CS was looking for CS's friend, but forgot what apartment the friend lived in. CS stated the female recognized CS's Colombian accent and asked if CS was looking for the "tubby" Colombian with black hair (AGUDELO is a heavy set Colombian male with black hair) and pointed to the door of Apt. 103 several times. The female pointed to the door of Apt. 103 and told CS "he lives there."

43.     Based on the above, there is probable cause to believe that AGUDELO has committed the Target Offenses and that he uses Target Location 2 as a drug and/or money stash location.

### Drug Traffickers' and Money Launderers' Use of Residences, Cell Phones, and Computers Generally

44.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at residences used by money launderers and drug traffickers, I am aware that the following kinds of evidence have typically been recovered from searches of such residences:

    a.      Books, records, receipts, notes, ledgers, and other papers relating to the collection and laundering of money, personal telephone/address books, electronic organizers, telephone bills, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and keys.

    b.      Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

    c.      Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from

14

trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

       d.     Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

       e.     Photographs, videos, or other records concerning the origination of bulk cash or the identities of coconspirators.

       f.     Cellular telephones owned or used by occupants.

45.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for money launderers to maintain in residences used by them records relating to their drug trafficking and money laundering activities.  Record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Additionally, drug traffickers and money launderers must maintain telephone, email, and address listings of clients and brokers and keep them immediately available in order to efficiently conduct their money laundering business.  I am also aware that drug traffickers and money launderers often maintain such documents related to their activities at the residences for an extended period of time.

46.    Furthermore, money launderers typically make use of wire transfers, cashier's checks, and money orders.  Money launderers also often maintain one or more currency counting machines to aid in counting bulk cash.  Evidence of financial transactions and records relating to income and expenditures of money and wealth in connection with money laundering is also typically maintained.

47.    Based upon my training and experience, as well as the training and experience of

other law enforcement agents I have worked with, I am also aware that drug traffickers and money launderers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes or other containers so that other individuals do not discover these materials.

48.    During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, I have learned from this and other investigations that records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons.  Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.  For example, a person involved in money laundering is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books and bills.  These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

49.    Based on training and experience, I know that most money launderers regularly use cellular telephones to communicate about their money laundering activities with customers, couriers, and other coconspirators.   In my training and experience, I also am aware that money launderers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as

prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, money launderers typically keep the phones in close proximity.  Additionally, in my experience, many money launderers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in residences maintained by them.  As a result, it is common to recover not only paper records pertaining to the use of the cellular phone by money launderers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from residences maintained by money launderers.

50.     Based upon my knowledge, training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

51.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who launder money typically use cellular telephones to communicate with their customers, their couriers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that persons who launder money regularly keep records of their illegal activities.  Records of money laundering can be produced and maintained on paper in a tangible form and/or by electronic means on cellular telephone, electronic/digital storage device and/or a computer.  In the case of electronic or digital media, the information can be maintained on the device itself or on portable digital storage media, making it easier to conceal.  I know that individuals involved in money laundering are very secretive in their activity in an effort to avoid detection, arrest and prosecution, and such persons usually are careful to deal only with someone they know, or who have been introduced to them by someone they know.  Additionally, in the conduct of their activities, they frequently employ code words or colloquial jargon when writing, texting or speaking on the telephone or in person, being careful to avoid the use of actual names of persons or narcotic substances, which, if overheard or seen, would be incriminating to themselves or their criminal associates.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments B on their cellular telephones.

52.     I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking and/or money laundering; and

18

accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers and money launderers meet with coconspirators, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where money launderers maintain bank accounts and conceal their proceeds.

53.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards. I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

a.     Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.     Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, electronic storage media often

19

contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

54.      Based on my training and experience, and the experience of other law enforcement officers who have participated in the execution of numerous search warrants, including participation in other drug investigations and extensive discussions with other law enforcement officials experienced in controlled substances investigations, I am also aware that it is common practice for drug traffickers to store drug-related paraphernalia, records, and documents necessary for drug trafficking operations in secure yet accessible locations such as their residences, places of business, and stash houses for longer periods of time than they keep drugs.  I have participated in the execution of search warrants of the residences of drug traffickers whose criminal activity is similar to that of QUIJANO and AGUDELO.  In the searches executed at residences and stash houses in connection with the drug investigations in which I have been involved, investigators typically recover drug-related evidence including cash, records, documents, drug distribution materials, drugs, and other valuable items.  Based on my training and experience, I believe that:

a.  Drug traffickers generally store their drug inventory, drug paraphernalia, drug proceeds, and drug records at or in their residences, businesses, drug stash houses, and/or vehicles;

b.  Drug traffickers will also generally seek to store their drug inventory, drug paraphernalia, drug proceeds, and drug records in the residences, businesses, and/or vehicles of relatives, trusted associates, or others in an effort to distance themselves from the drugs they are selling and to shield themselves from detection by law enforcement, or by setting up what is commonly referred to as a "stash house," typically a residence or commercial location registered in the name of others and used to store drugs or to prepare drugs for distribution;

c.  Drug traffickers often find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside of the normal banking system. Accordingly, drug traffickers frequently maintain large amounts of cash and other valuable assets at their residences, businesses, stash houses, or vehicles, in order to maintain and finance their ongoing business, and often keep one or more currency counting machines to aid in counting drug proceeds.  Drug traffickers also often make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking and money laundering is also generally maintained in the residences, businesses, stash houses or vehicles of those involved in selling drugs or their relatives or trusted associates;

d.  Drug traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, emails, and other documents relating to the transportation, ordering, sale and distribution of controlled substances, and monetary instruments and other assets, and to debts and collections relating to monies owed or due for the distribution of controlled substances; and documents relating to the transportation of controlled substances, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passport and visas, and credit card receipts.  Such documents may be maintained in paper or electronic form, and are generally maintained where the drug traffickers have ready access to them, including in cell phones and other electronic media capable of storing such information electronically, at locations such as their residences or other locations where they regularly conduct their drug business.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficker business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises;

e.  It is common for drug dealers to secrete records of drug transactions in secure

location within their cell phones, computers, residences, businesses, and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement officials;

f.      It is common for significant drug traffickers to hide controlled substances, proceeds of drug sales (i.e., large amounts of currency, financial instruments, jewelry, safety deposit keys and deeds to real property), and records relating to income from controlled substances and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, documents indicating travel in interstate and foreign commerce, and evidence of financial transactions relating to obtaining, transferring, hiding or spending large sums of money made from controlled substance trafficking activities in secure locations within residences, businesses, drug stash locations, or other locations over which they maintain dominion and control, for ready access and to conceal them from law enforcement officials;

g.      Drug traffickers commonly maintain electronic and paper books or documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization, and other contact or identification data relating to the distribution of controlled substances.  Such records and items are maintained where the traffickers have ready access to them, commonly on the traffickers' cellular telephone(s).  They also tend to maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing;

h.      Drug traffickers commonly have photographs of themselves, their associates, their property and their products in their possession or in their residences, and frequently maintain these photographs on the cellular telephone(s) and other electronic devices;

i.      Drug traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, safe-deposit boxes and other containers, which are further secured by combination and/or locks of various kinds in order to hide the contraband from other individuals living at or in the vicinity of their residences or stash houses;

j.      Drug traffickers frequently build "stash" places within their residences or other locations in order to store illicit drugs as well as the items described above;

k.      Residents, whether drug traffickers or not, typically keep items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cellular telephones, cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

l.      Drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at residences or drug stash houses.  Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug

traffickers.  Such numbers can confirm identities of particular speakers and the occurrence of certain events.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants of stash houses or residences that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained;

m.     Drug traffickers often attempt to launder/legitimize the proceeds of illicit drug distribution and to otherwise conceal such proceeds from discovery by law enforcement. To do so, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found either inside the residence, stash houses, businesses, or vehicle of the drug trafficker or inside the residence, business, or vehicle of the person in whose name the asset is listed.

55.     Based on all of the evidence I have obtained in the course of this investigation, and for the reasons set forth above, I believe QUIJANO and AGUDELO, like many drug traffickers/money launderers, uses their residences and/or stash locations in furtherance of their ongoing drug-trafficking and/or money laundering activities, and that, among other things, documentary and other evidence regarding those activities, including, but not limited to, the items set forth in Attachments B, will be found in the Target Locations.  *See e.g., United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999).[2]

## CONCLUSION

56.     Wherefore, there is probable cause to believe that violations of the Target Offenses will be located at the Target Locations and that the items described in Attachments B, which

---

[2] In *Feliz*, the First Circuit made clear that, in the drug trafficking context, evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after evidence of the last transaction. 182 F.3d at 87 ("[C]ourts have upheld determinations of probable cause in trafficking cases involving [three months long] or even longer periods") (citing *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991) (two-year-old information relating to marijuana operation not stale)). As the First Circuit has explained, "[b]y it's very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time." *United States v. Nocella*, 849 F.2d 33, 40 (1st Cir. 1988).

constitute fruits, instrumentalities and/or evidence of these, violations are presently located inside

the Target Locations, described in Attachments A.

I declare that the foregoing is true and correct.

Sean Sears
DEA Special Agent

Subscribed and sworn to before me
this _____ day of February, 2020.

02/12/2020

HONORABLE M. PAGE KELLEY
CHIEF UNITED STATES MAGISTRATE JUDGE

24

## ATTACHMENT A-1

## 44 SEAFOAM AVENUE, APARTMENT #2, MASSACHUSETTS
### (TARGET LOCATION 1)

44 Seafoam Avenue, Apartment #2, Winthrop Massachusetts, is an apartment inside a two-story residence.  The residence has white siding and two blue front doors.  The front entrance to the building located at 44 Seafoam Avenue faces Seafoam Avenue. The residence also has a side entrance door that faces a driveway on the right side of the building.  Apartment 2 is a second-floor apartment accessed through an interior staircase and hallway and has a number 2 on the first floor entrance door.



**ATTACHMENT B-1**

(Items to be seized from Target Location 1)

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Section 1956 and 1957 (money laundering) and/or Title 21, United States Code, Section 846 (cocaine trafficking and conspiracy) (the "Target Offenses"):

1.      Books, records, receipts, notes, ledgers, and other papers relating to the collection and laundering of money, personal telephone/address books, electronic organizers, telephone bills, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and keys.

2.      Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

3.      Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4.      Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5.      Photographs, videos, or other records concerning the origination of bulk cash or the identities of coconspirators.

6.      Cellular telephones believed to be used by Fabio QUIJANO, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing money laundering and/or referencing individuals engaged in money laundering, located in the memory of any mobile telephone, including but not limited to:

   a.      Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in money laundering;

   b.      Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c.   Text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing money laundering and/or referencing individuals engaged in money laundering;

d.   Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing money laundering;

e.   GPS data;

f.   Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing money laundering or individuals engaged in money laundering;

g.   Documents, photographs, or videos in any format, including but not limited to
Microsoft Word or Adobe PDF files, relating to or referencing money laundering;

h.   All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.   Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

**ATTACHMENT A-2**

**55 BELLE ISLE AVENUE APT. 103, REVERE, MASSACHUSETTS  (TARGET LOCATION 2)**

    55 Belle Isle Avenue Apt. 103, Revere, Massachusetts, is an apartment inside a three story apartment building.  The front entrance to the building located at 55 Belle Isle Avenue faces Belle Isle Avenue and is marked with the words "Chateau Richelle" in white lettering on the building to the left of the glass entrance vestibule connecting the building marked "Chateau Richelle" with another three story apartment building marked with the words "Casa Carla." The building is also marked with the number "55" placed over the glass entrance door of the vestibule. The building also has a side entrance door that faces a parking lot on the left side of the building.  Apartment 103 is a first-floor apartment accessed through an interior staircase and hallway and has no markings on the door.

 

**ATTACHMENT B-2**
(Items to be seized from Target Location 2)

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Section 1956 and 1957 (money laundering) and/or Title 21, United States Code, Section 846 (cocaine trafficking and conspiracy) (the "Target Offenses"):

1.      Books, records, receipts, notes, ledgers, and other papers relating to the collection and laundering of money, personal telephone/address books, electronic organizers, telephone bills, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and keys.

2.      Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

3.      Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4.      Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5.      Photographs, videos, or other records concerning the origination of bulk cash or the identities of coconspirators.

6.      Cellular telephones believed to be used by Jairo AGUDELO, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing money laundering and/or referencing individuals engaged in money laundering, located in the memory of any mobile telephone, including but not limited to:

              a.      Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in money laundering;

b.    Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c.    Text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing money laundering and/or referencing individuals engaged in money laundering;

d.    Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing money laundering;

e.    GPS data;

f.    Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing money laundering or individuals engaged in money laundering;

g.    Documents, photographs, or videos in any format, including but not limited to
Microsoft Word or Adobe PDF files, relating to or referencing money laundering;

h.    All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.    Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.